United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINDSEY BLACKBURN,

Plaintiff,

v.

CLASSPASS USA LLC,

Defendant.

Case No. 25-cv-06109-WHO

**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY THE CASE**

Re: Dkt. No. 28

Plaintiff Lindsey Blackburn ("Blackburn") brings this action on behalf of a putative nationwide class and California subclass of ClassPass subscribers. She alleges that defendant ClassPass, USA LLC ("ClassPass"), has engaged in unlawful practices in violation of federal and state laws because of its practice of issuing "Credits" that expire before a member can use them. ClassPass moves to stay the case pending arbitration because Blackburn has agreed to arbitrate through either or both of her 2019 and 2023 acknowledgments of ClassPass's Terms of Use. Blackburn contends that she did not (1) receive reasonable notice of the contents of the Terms of Use and (2) manifest assent to the Terms of Use. The parties do not dispute that the arbitration agreement would encompass Blackburn's claims if it is valid. Because I conclude that ClassPass provided reasonably conspicuous notice of its Terms of Use and that Blackburn manifested assent to the Terms of Use, the arbitration agreement at issue is valid. ClassPass's Motion to Stay Pending Arbitration is GRANTED.

## BACKGROUND

### A. Factual Background

ClassPass is a Virginia-incorporated, New York-based company that operates throughout the United States. Complaint ("Compl.") [Dkt. No. 1] ¶ 12. It primarily sells access to discreet exercise classes but also provides its users with access to wellness and beauty services as well as

food "experiences." Compl. ¶ 1. ClassPass does not offer these experiences itself, but rather partners with gyms, spas, restaurants, etc. to make these experiences available to its users. ClassPass users purchase ClassPass "Credits" and use those Credits like tokens to trade for access to the experiences. *Id.* Depending on the type of experience, differing amounts of Credits are required. For example, a strength and conditioning exercise class at one facility may cost 5 Credits, while a 90-minute massage at another facility may cost 34 credits. Compl. ¶ 18, Fig. 3.

ClassPass users can buy standalone Credits as well as monthly plans, where they receive a certain number of Credits per month (45 Credits per month is typical). Compl. ¶ 19. Blackburn alleges that ClassPass designs the Credit receipt program so that (1) if a user purchases additional Credits above the monthly allotment, any leftover Credits do not roll over to the next month and (2) after two months, when a new month of membership begins, any leftover Credits above a user's set monthly amount automatically expire. Compl. ¶¶ 19–21. Additionally, when users cancel their membership, their Credits expire. Compl. ¶ 22. Users are not provided with a means to use their remaining Credits, nor are they refunded the cost of the Credits once the Credits expire.

Many users have complained about these policies, expressing frustration with purchasing Credits, being unable to use them before they expire for any number of personal reasons, and not getting the benefit of their purchase. Compl. ¶¶ 23–24. Customers have described ClassPass's Credit allocation system as a "scam." *Id.*

### 1. Blackburn's Experiences With ClassPass

Blackburn initially became a ClassPass member in 2019 and finally ended her subscription on May 25, 2024. She first signed up for a ClassPass account using her Facebook credentials on May 23, 2019. Dkt. No. 28 at 7; Dkt. No. 31 at 8–9.[1] Six days after signing up for an account, she used ClassPass's "refer-a-friend" program to secure a free trial membership. Through the refer-a-friend program, she received 35 free ClassPass credits. Exh. F, Dkt. No. 28-1 at 18; Dkt. No. 31 at

---

[1] At this stage in the litigation, although I consider all allegations in the complaint to be true, I also must "consider all relevant, admissible evidence submitted by the parties," in "reviewing [a] motion[] to compel arbitration." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 705 (9th Cir. 2024) (internal quotation marks and citations omitted).

5. After her free membership concluded, Blackburn continued to use ClassPass for eight months during which she paid an ongoing monthly membership fee to purchase Credits. She discontinued her monthly membership in early 2020.

Blackburn reactivated her membership on December 26, 2023, when she received a 43-Credit one-month trial to rejoin ClassPass. Exh. H, Dkt. No. 28-1 at 22. As a part of her sign-up process to reactivate her membership, ClassPass advertised that the accounts had "[m]ore flexibility than ever before," in part because there were "[n]o contracts or commitments—Memberships are month-to-month and we make changing your plan easy." Exh. G, Dkt. No. 28-1 at 20. At the end of her one-month free trial, Blackburn's plan automatically renewed and ClassPass charged her $89 for her monthly membership fee. Dkt. No. 28 at 12. She continued with her monthly membership until May 26, 2024. *Id.*

Blackburn alleges that while she was a ClassPass member, she lost Credits that she had purchased through her monthly membership because of ClassPass's system of monthly Credit expiration. Compl. ¶¶ 47–48. She ultimately ended her subscription due to frustration with ClassPass's Credit expiration policy. Compl. ¶ 48. In her complaint, she first alleges that ClassPass's Credits function as prepaid cards within the meaning of the Credit Card Accountability Responsibility and Disclosure Act (the "CARD Act") and the Electronic Funds Transfer Act (the "EFTA"), which prohibit the use of pre-paid cards that expire within five years of their issuance. In the alternative, she contends that each ClassPass Credit acts as a "gift certificate" or "gift card" under the CARD Act and the EFTA. Compl. ¶¶ 31–42. Finally, Blackburn asserts that ClassPass's Credits meet the definition of "gift certificate" under California's Civil Code § 1749.5.

**2. ClassPass Sign In Screens**

United States District Court
Northern District of California

Blackburn first signed up for a ClassPass account on May 23, 2019.  Dkt. No. 28 at 3. While logged into her Facebook account on her mobile device, Blackburn navigated to a ClassPass sign in screen and signed up for a ClassPass account using her Facebook credentials. She was directed to do so via the following screen:



("2019 Sign Up Screen") Dkt. No. 28, Exhibit B.

The top of the page reads "Sign Up," directly underneath which is a large blue clickable button that reads "Continue with Facebook."  Below the "Continue with Facebook" button, a short paragraph of text in smaller font reads: "If you sign up through Facebook, you agree to the **Terms of Use** and **Privacy Notice**.  If you do not want to let other ClassPass users see your profile, sign up with your email instead of through Facebook, and uncheck the box [below]."  *Id.*  Both **Terms of Use** and **Privacy Notice** were written in bold, blue, and underlined font, signifying the existence of a hyperlink.  After presented with the opportunity to "Continue with Facebook,"

Blackburn was presented with additional screens to create her account, explaining that she would get her first two weeks free once she "activate[d]" her membership, and requiring her to verify her phone number to finish setting up her account. Exhs. C, D, E, Dkt. No. 28-1 at 11-16.

Although Blackburn finished setting up her account on that day, she did not sign up for the ClassPass membership until six days later, using ClassPass's "refer-a-friend" program. In doing so, again using her mobile device, she was directed to the following screen:



Exh. F ("2019 Checkout Screen"), Dkt. No. 28-1 at 18. The top of the screen reads "Checkout," and the largest visual objects on the screen are two colored buttons reading "G Pay" and "Redeem now" so Blackburn could purchase (for free) the 35 available Credits. Just below those buttons in light grey font reads: "By clicking the Redeem now button, I agree to the Offer Terms and **Terms of Use** and acknowledge that I have read the **Privacy Notice** and **Cookie Policy**." *Id.* Although underlined and bolded (again, in light grey font, as compared to the darker grey font used

United States District Court
Northern District of California

elsewhere on the screen), the words "**Terms of Use**, **Privacy Notice**, **and Cookie Policy**" were not displayed in typical blue-hyperlink color.

During reactivation of her ClassPass membership in December 2023, Blackburn was shown the following screen as the final step in her reactivation:



Exh. H ("2023 Reactivation Checkout Screen"), Dkt. No. 28-1 at 22.  There is no title at the top of the screen, and the most prominently displayed part of the screen are again two colored buttons at the bottom, reading "Buy with G Pay" and "Pay with card."  *Id.*  Just above those buttons is a one-sentence paragraph written in small, light grey, font, that reads: "By clicking the button below, I agree to the Offer Terms and **Terms of Use** and acknowledge that I have read the **Privacy Notice** and **Cookie Policy**."  *Id.*  Again, the words "**Terms of Use**, **Privacy Notice**, **and Cookie Policy**" were not displayed in typical blue-hyperlink color, but they are written in bold text.  In the preceding paragraph, however, ClassPass included some standout language using a different visual

hook.  First, in black and bolded font, ClassPass explains: "**you'll automatically be charged for a full-priced monthly credit plan subscription**" at the conclusion of the free trial.  *Id.*  And, in blue, hyperlinked font, ClassPass includes a link for a user to read about what Fees may apply.

### 3.  The Terms of Use

Had Blackburn accessed the "Terms of Use" links at the time of her checkouts, she would have been redirected to ClassPass's 2019 and 2023 Terms of Use.  Both include the following advisory note on the first page:

> THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASS PASS ON AN INDIVIDUAL BASIS.  PLEASE SEE SECTION 18 FOR MORE INFORMATION ABOUT THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER.  YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND CLASSPASS WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS WIDE ARBITRATION.

Exhs. A, B, Van Meter Decl. [Dkt. No. 28-2] at 4, 29.

### B.  Procedural Background

Blackburn filed her Complaint on July 21, 2025, on behalf of herself as an individual, a putative nationwide class, and a putative California subclass.  Compl. ¶¶ 49–50.  In her complaint, she alleges three causes of action against ClassPass: (1) violations of the CARD Act and EFTA on behalf of herself and the nationwide class, Compl. ¶¶ 56–64; (2) violations of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*, on behalf of herself and the California subclass, Compl. ¶¶ 65–78; and (3) violations of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, on behalf of herself and the California subclass, Compl. ¶¶ 79–94.  She seeks injunctive and declaratory relief as well as damages and restitution.  Compl. at 24.

On November 26, 2025, ClassPass filed a motion to compel arbitration, stylized as a Motion to Stay Pending Arbitration.  Motion to Compel ("Mot.") [Dkt. No. 28].  Blackburn opposed the motion, contesting the premise that she had ever agreed to arbitrate in the first instance.  Opposition to the Motion to Compel ("Oppo.") [Dkt. No. 31].  ClassPass replied.  Reply ISO Motion to Compel ("Reply") [Dkt. No. 28].  I held a hearing on the motion on April 1, 2026.

United States District Court
Northern District of California

<b>LEGAL STANDARD</b>

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C. §§ 1 et seq.  Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

<b>DISCUSSION</b>

Blackburn does not dispute ClassPass's arguments that the scope of the arbitration agreement would reach her claims in this case.  Instead, she argues that the arbitration agreement is not valid because ClassPass did not provide reasonably conspicuous notice of the existence of the arbitration agreement and she never provided unambiguous, manifest assent.  Oppo. 8–24.  *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("The [FAA] requires district courts to compel arbitration of claims covered by an *enforceable* arbitration agreement.") (emphasis added).  "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation."  *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 510 (9th Cir. 2023).  Under California law, "there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."[2]  *Id.* at 512–13.

---

[2] The Terms of Use are governed by New York law.  Van Meter Decl. Exhs. A & B § 19(a).  For the purposes of determining the validity of the arbitration agreement, however, I look to California law.  New York and California law are substantively the same insofar as contract validity is concerned.  *See Berman*, 30 F. 4th at 855.

United States District Court
Northern District of California

"In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different 'assent' mechanisms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). Courts routinely enforce clickwrap and scrollwrap, and decline to enforce browsewrap. *See id.* Blackburn contends (and ClassPass does not contest) that the type of internet contract at issue here is sign-in wrap.

With sign-in wrap, "the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Id.* As Blackburn indicates, "[g]iven the present state of California law, website designers who knowingly choose sign-in wrap . . . over clickwrap and scrollwrap designs practically invite litigation over the enforceability of their sites' terms and conditions as the fact-intensive inquiry over what 'makes a given textual notice sufficiently conspicuous . . . invariably lends itself to a more subjective than objective analysis." *Berman*, 30 F.4th at 868, n. 4. (Baker, J., concurring). But "a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024).

## I. Reasonably Conspicuous Notice

"To be conspicuous, the notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Chabolla*, 129 F.4th at 1155. Doing so involves an inquiry related to the visual aspect of the notice (including a review of the "font size, text placement, and overall screen design") as well as the "context of the transaction." *Id.* "The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together. *Id.*

### A. Visual Aspects of the ClassPass Website

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because online providers have complete control over the design of their websites, the

9

onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Berman*, 30 F.4th at 857 (citation modified).

The parties somewhat dispute whether ClassPass was required to put Blackburn on notice of the Terms of Use during the creation of her account or during the activation(s) of her paid membership. *See* Reply 6, n.3. I consider all methods that ClassPass used to notify users of the Terms of Use.

### 1. 2019 Login

There is "no bright-line test for finding that a particular design element is adequate in every circumstance. [Courts] must instead consider how those design elements appear on the page." *Chabolla*, 129 F.4th at 1156–57.

The 2019 Sign Up Screen is the second screen in a five-screen process for a user to create a ClassPass account. It presents the Terms of Use with a bolded, blue hyperlink within a two-sentence paragraph written in black font against a white background. "Terms of Use" and "Privacy Policy" are written in blue—the traditional connotation that a hyperlink is embedded in the text of the page. This two-sentence paragraph is located under the "Continue with Facebook" button.

Blackburn presents three issues with the visual layout of the 2019 Sign Up Screen. First, she argues that the use of five screens with the Terms of Use available only on the second screen with "more colorful and eye-catching images" on other screens purposefully directs a user's attention elsewhere. Oppo. 9–10. Second, she argues that the text on the 2019 Sign Up Screen is "the smallest sized font not only of the second screen [but] of *any* screen in this transaction flow." Oppo. 10–11. Finally, she argues that the placement of the two-sentence paragraph containing the Terms of Use hyperlink *below* the "Continue with Facebook" button encourages a user intending to create an account using her Facebook credentials to move forward without viewing the rest of the page. *See, e.g.*, *Chabolla*, 129 F.4th at 1157 ("A reasonably prudent user would likely click 'Continue' and read no further.").

The final visual aspect of the 2019 Sign Up Screen does somewhat deemphasize a user's likelihood to access ClassPass's Terms of Use. But the multiple screens and font size are not an

10

issue here.  Although a user must interact with multiple screens in the process of signing up for a ClassPass account, the screens are not cluttered and follow a logical flow: (1) Information about the sign-up process; (2) 2019 Sign Up Screen; (3) Explanation of the 2-week free perk; (4) Verification of a user's phone number; (5) Inputting the verification code to create an account. *See* Exhs. A–E.  None of the screens present an overwhelming amount of textual information.  Further, Blackburn's contention that the font size on the 2019 Sign Up Screen is smaller than all other font does not appear to be correct on the face of the screens.  ClassPass points out that the "notice text is the *same* size as the majority of the text on the Sign Up screen, and only slightly smaller than the text in the title, action buttons, and form fields."  Reply 5.  And, despite the placement of the "Continue with Facebook" button on the 2019 Sign Up Screen as the primary visual stimulus, the "Terms of Use" is bolded, underlined, and in traditional hyperlink blue.  That offsets any real concern that a reasonably prudent Internet user would not know or be aware that those hyperlinks existed just below the "Continue with Facebook" button.

The 2019 Checkout Screen, by contrast, presents the Terms of Use with a bolded and underlined font, but in a paragraph of text that appears lighter (but still bolded) grey than the rest of the text on the page.  The text is against a white background and is not written in blue.  Blackburn argues that this font choice is unacceptable because "it is not readily apparent that ClassPass's terms are hyperlinked and they appear in large text blocks that discuss various other terms."  Oppo. 15.  That is not so.  The text is still visually set apart from the other font that appears on the screen, despite the fact that it does not appear in blue font.

As the Ninth Circuit held in *Chabolla*, there is no bright-line rule that a website's hyperlinked terms of service must be set apart in blue, bolded, and underlined font.  *Chabolla*, 129 F.4th at 1157; *see also Oberstein*, 60 F.4th at 516–17 (holding that notice was conspicuous when marked in blue font without any underlining or bolding); *Keebaugh*, 100 F.4th at 1021 (requiring only "a contrasting font color" to make notice legible against a given background).  Here, the hyperlinks are denoted by a bolded light grey font and underline, sufficiently contrasting the white background.  Further, the "large text block[]" to which Blackburn refers is actually a two-sentence paragraph separated in space by the one-sentence paragraph denoting the **Terms of Use**, which

United States District Court  
Northern District of California

makes the presentation of the **Terms of Use** hyperlink even more noticeable.

Both the 2019 Sign Up Screen and the 2019 Checkout Screen provide reasonably conspicuous visual notice of ClassPass's Terms of Use.

### 2. 2023 Login

The 2023 Reactivation Checkout Screen is similar to the 2019 Checkout Screen. The text referring to the **Terms of Use** is once again just above the commitment button, written in light grey, but bolded font, and while not denoted in traditional hyperlink blue, is set apart from the rest of the text on the screen such that its presence draws the eye. *See* Exh. H, Dkt. No. 28-1 at 22. The primary difference between the 2023 Reactivation Checkout Screen and the 2019 Checkout Screen, as Blackburn points out, is that the 2023 Reactivation Checkout Screen includes a black and bolded pronouncement to the user that "**you'll automatically be charged for a full-priced monthly credit plan subscription**" and includes, in blue and underlined hyperlinked font, access to information about which Fees may apply. *Id.*; Oppo. 17. Those decisions to add additional notice of specific terms do not take away from ClassPass's efforts to make the **Terms of Use** conspicuous by setting them apart in bolded, underlined font, in a separate paragraph with font color that contrasts the white background.

Blackburn was provided with reasonably conspicuous visual notice through the 2023 Reactivation Checkout Screen.

### B. Context of the Transactions

I next look to the context of the varying transactions to "inform whether [the ClassPass] website[s] offered reasonably conspicuous notice of the terms of an agreement." *Chabolla*, 129 F.4th at 1155. Contextually, the "nature of an agreement may anticipate 'some sort of continuing relationship . . . that would require some terms and conditions' [that] [a] user should expect . . . even if not explicitly told." *Id.* (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480 (2021)).

> The language in *Chabolla* is instructive:
> Taken as a whole, the landing page and [varying] screens . . . give some indication of a continuing relationship. The user is invited to 'join ClassPass' and the purchase is described as a 'plan' or 'a membership.' The point of ClassPass is to gain access to gyms,

studios, and classes for fitness and wellness benefits, a proposition that should conjure in reasonable minds at least the specter of continuing habit. On the other hand, users are advised that they are 'never locked in,' that there are 'no commitments,' and that they can 'cancel anytime.'

*Id.* The Ninth Circuit held that the "'context of the transaction' at issue [t]here neither weighs in favor of nor against the notice requirement." *Id.* at 1156. Given ClassPass's assurances here including: "Committing is hard – so don't" and that there were "No contracts or commitments," I am inclined to follow the *Chabolla* panel's conclusion in the instant case. Exh. E, Dkt. No. 28-1 at 8; Exh. G, Dkt. No. 28-1 at 20. But unlike in *Chabolla*, Blackburn took the additional step and created a ClassPass account by logging in with her Facebook account. The account creation shows that there would be "some sort of continuing relationship . . . that would require some terms and conditions." *Sellers*, 73 Cal. App. 5th at 480.

As a whole, considering both the visual and contextual indicators of the three ClassPass login screens, it is clear that ClassPass provided reasonably conspicuous notice of both the 2019 and 2023 Terms of Use.

## II. Unambiguous Manifest Assent

Because ClassPass provided reasonably conspicuous notice of both Terms of Use, whether Blackburn manifested assent to the Terms of Use is something of a nonissue. What is required is that "the consumer takes some action, *such as clicking a button* or checking a box, that unambiguously manifests his or her assent to those terms" that were reasonably conspicuous. *Keebaugh*, 100 F. 4th at 1014 (emphasis added); *see also Oberstein*, 60 F.4th at 515 ("The second part of the test—whether the user takes some action that unambiguously manifests assent—is relatively straightforward."), *Berman*, 30 F.4th at 857 ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement."). Here, there is no dispute that Blackburn clicked a button after being presented with a hyperlink to the Terms of Use. On the 2019 Sign Up Screen, she clicked the "Continue with Facebook" button; on the 2019 Checkout Screen, she clicked either the "G Pay" or "Redeem now" button, and on the 2023 Reactivation Screen, she clicked either the "Buy with G Pay" or "Pay with card" buttons. *See*

Exhs. B [Dkt. No. 28-1 at 10], F [Dkt. No. 28-1 at 18], and H [Dkt. No. 28-1] at 22.

Notwithstanding that, Blackburn asserts that her conduct does not show manifest assent. She first compares the 2019 Sign Up Screen to the screen the court in *Chabolla* held failed to establish unambiguous assent. Oppo. 19– 20. But in *Chabolla*, there was no indication that a user was ever signing up. Here, at the top of the 2019 Sign Up Screen there is a heading that unambiguously reads in bold lettering: **Sign up**. A user then has the option to "Continue with Facebook," as Blackburn chose to do, or a user may fill out additional information and click the button at the bottom of the screen that likewise informs users that the purpose of the button is to: **Sign up**. Exh. B [Dkt. No. 28-1 at 10]. Her comparison to *Chabolla* is inapt.

Blackburn next argues that the 2019 Sign Up Screen presents an ambiguity because ClassPass informs users in one location of the screen that by signing up they would agree to "*the*" Terms of Use and in another part of the screen it informs users that by signing up they agree to "*our*" Terms of Use—creating an ambiguity about whether the Terms of Use a user is agreeing to be bound by are Facebook's or ClassPass's. Oppo. 20–22. This makes no sense. If a user is signing up through a preexisting Facebook account, that user must have necessarily already agreed to be bound to any Terms of Use or other terms of Facebook. It is not ambiguous to a reasonable Internet user signing up for an account or membership with ClassPass, even by way of Facebook, that any newly presented Terms of Use are those of ClassPass, not Facebook.

Blackburn's arguments concerning the 2023 Reactivation Screen also fall flat.[3] She maintains that the dual buttons create an ambiguity and preclude any manifest assent because the one-sentence paragraph preceding the buttons reads: "By clicking *the* button below . . ." instead of more specifically noting something akin to "either of the buttons below" does not allow a user to manifest assent to the Terms of Use. Oppo. 24–25 (emphasis added). Here, "the" in the context of the 2023 Reactivation Screen must mean "either," because a user attempting to access the 45

---

[3] I do agree with Blackburn that the 2019 Checkout Screen's language ("By clicking the Redeem now button, I agree to the Offer Terms and **Terms of Use** . . .") is curious because it leaves out whether a user who chooses to pay using G Pay is likewise bound. Oppo. 22. But a reasonable Internet user would likely understand that payment using either method would bind the user to the visibly hyperlinked **Terms of Use** and it is clear that Blackburn manifested assent via the 2019 Sign Up Screen and 2023 Reactivation Screen in any event.

14

free Credits can only click *one* button to do so, or as the 2023 Reactivation Screen denotes, "*the* button." *See* Exh. H [Dkt. No. 28-1] at 22. *Cf. Herzog v. Sup. Ct.*, 101 Cal. App. 5th 1280, 1304 (2024) (holding that the "text on the screen explicitly told users it meant something else" and so could not amount to manifest assent); *Lee v. Plex*, 773 F. Supp. 3d 755, 767 (N.D. Cal. 2025) (Lee, J.) (holding that where the language of the sign up page read: "By creating an account or continuing to use a [site] application, website, or software, you acknowledge and agree that you have accepted the **Terms of Service** and **Privacy Policy**," that language was "ambiguous because it describes two actions that constitute assent, but neither matches the 'Continue with Facebook' button that Plaintiff clicked."). Blackburn additionally and unambiguously manifested assent to the 2023 ClassPass Terms of Use by clicking either button to access the 45 free Credits on the 2023 Reactivation Screen.

In sum, ClassPass has established that its sign in pages provided reasonably conspuicuous notice of the Terms of Use and that Blackburn assented to it. Blackburn does not dispute the scope of the agreement if validity is established. Accordingly, I conclude that the arbitration agreement included in the Terms of Use is valid and enforceable.

## CONCLUSION

For the reasons set forth above, ClassPass's Motion to Stay Pending Arbitration is GRANTED. The case is STAYED until the conclusion of arbitration in accordance with the terms of the Arbitration Agreement. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). The parties shall file a Joint Status Report on or before October 9, 2026, and every six months thereafter, to describe the progress of the arbitration. They shall notify the court within ten days of the resolution of the arbitration.

**IT IS SO ORDERED.**

Dated: April 9, 2026



William H. Orrick
United States District Judge